UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**PORT OF PORTLAND,** a Port District
of the State of Oregon,

                    Plaintiff,

            v.

**U.S. BANK NATIONAL ASSOCIATION,**
a Delaware Corporation, as Trusteeship Created
by the Port of Portland's Ordinance No. 364
enacted on June 10, 1992, effective as of July
11, 1992, Relating to $8,545,000 of the Port
of Portland Special Obligation Revenue Bonds,
Series 1992 (Delta Air Lines, Inc. Project),

                    Defendant.

No. CV 09-1078-MO

OPINION AND ORDER

**MOSMAN, J.,**

        This case involves the financing of three buildings constructed at the Portland Airport for

the use of Delta Airlines ("the Project"). In 1992, the Port of Portland enacted Ordinance No. 364

to finance the Project through the sale of $8.545 million in Special Obligation Revenue Bonds

("the Bonds"). Under the terms of the Ordinance, principal and interest on the Bonds are to be

paid through building "Revenues" in the form of rent from Delta's 30-year lease of the Project

("the Lease"). (Ordinance §§ 1.1, 1.4; Lease §§ 1.1, 4.1, 4.4.)[1] Delta defaulted on its rent

---

[1] Citations to Ordinance § ___ refer to provisions of Ordinance No. 364, which is
attached as Exhibit 2 to the Declaration of Richard Price in Support of Plaintiff's Motion for
Summary Judgment (#21). Similarly, citations to Lease § ___ refer to provisions of the Facilities

obligations in 2005, the year the airline filed for bankruptcy, and the Project has remained vacant ever since. U.S. Bank, representing the interests of the Bondholders as trustee, recovered a small portion of the unpaid rents by executing a settlement agreement with Delta during bankruptcy proceedings. The settlement agreement released Delta from further obligation under the Lease.

After unsuccessful attempts to lease the buildings to other tenants, the Port filed this action in an attempt to remove the buildings and regain the use of the valuable airfield land on which the buildings are located. Before removing the buildings, the Port seeks a declaratory judgment that it has no obligation to U.S. Bank with respect to the use of the buildings, specifically no obligation to preserve the buildings for future tenants who could provide revenue to the Bondholders. Because two plausible interpretations of the relevant terms give rise to an ambiguity, I DENY Plaintiff's Motion for Summary Judgment (#18).

## DISCUSSION

### I.    Legal Standard

#### A.    *Summary Judgment*

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

_____

Lease between Delta and the Port, which is attached as Exhibit 3 to the Price Declaration (#21).

B.    *Contract Interpretation*

The Ordinance is a contract between the Port and the Bondholders. (Ordinance § 1.6.) In Oregon, "the interpretation of an unambiguous contract is a question of law for the court," *Chambers v. Sch. Dist. No. 40, Wasco Cty.*, 540 P.2d 1026, 1028 (Or. Ct. App. 1975), as is the question of whether an ambiguity exists, *Bartlam v. Tikka*, 622 P.2d 1133, 1135 (Or. Ct. App. 1981). A contract provision is ambiguous if it is "susceptible to at least two plausible interpretations when examined in the context of the contract as a whole." *Anderson v. Divito*, 908 P.2d 315, 319 (Or. Ct. App. 1995). If the court determines that a contract is ambiguous, extrinsic evidence of the parties' intent is admissible to resolve the ambiguity and meaning of the contract is a question of fact. *Id.* Therefore, it would be appropriate to grant the Port's Motion for Summary Judgment only if the contract unambiguously supported the Port's interpretation.

II.    **The Bondholders' Right to "Basic Rent" and "Amounts Representing Basic Rent"**

The critical issue for purposes of deciding the Port's Motion for Summary Judgment is whether the Bondholders' entitlement to "Revenues" includes an entitlement to future rent income from commercial tenants other than Delta. (Ordinance § 1.4.) The Port argues that the Ordinance and the Lease provide the exclusive remedies for collecting Revenues, and that each and every remedy provided under those agreements must be exercised against Delta. (*See* Pl.'s Reply (#29) 8.) Because U.S. Bank and Delta reached a settlement agreement that released Delta from any further liability under the lease, the Port reasons that the settlement agreement constituted the full measure of relief to which the Bondholders are entitled and U.S. Bank has no further rights to potential revenues from the Airport facilities. I agree that the plain language of the Ordinance restricts Revenues to those amounts obtained through remedies provided in the Lease or the Ordinance. But these contracts do not unambiguously require the Bondholders'

remedies to be exercised exclusively against Delta.

Under the Ordinance, the Bonds are payable exclusively from the Project's Revenues. Revenues are defined, in relevant part, as:

(a)    the Basic Rent payable under Section 4.1(a) of the Lease made with respect to the Bonds . . . including amounts representing Basic Rent obtained by the trustee or the Issuer through the exercise of the remedies provided in the Lease or this Ordinance (including any reletting proceeds), and all receipts of the Trustee credited under the provisions of this Ordinance against said amounts payable.

(Ordinance § 1.1.) Because Revenues are defined as "Basic Rent" and "amounts representing Basic Rent," the interpretation of those terms is the critical issue for purposes of resolving the Port's motion.

Basic Rent is defined in section 1.1 of the Ordinance as "those rental payments required to be made by [Delta] or any successor or assign pursuant to Section 4.1 of the Lease." Section 4.1 of the Lease describes Delta's Basic Rent obligation in greater detail, indicating that "Basic Rent" is essentially Delta's obligation to pay the principal, redemption premium, and interest on the Bonds. Delta's agreement to pay Basic Rent is an absolute and unconditional obligation under the Lease. (Lease §§ 4.1, 4.4.)

Section 1.1. of the Ordinance specifies that "amounts representing Basic Rent" must be "obtained . . . through the exercise of the remedies provided in the Lease or this Ordinance (including reletting proceeds)." Sections 8.2 and 8.4 of the Lease create the Port's and U.S. Bank's remedies in the event of Delta's default. Specifically, section 8.2 of the Lease empowers the Port and U.S. Bank, as trustee, to take the following action in response to an Event of Default: (a) take legal action to collect the amounts owed under the lease; (b) take possession of the Project without terminating the Lease, sublet the Project, and hold Delta liable for the difference between the amount due under the Lease and the amount paid by the sublessee; (c) terminate the Lease and then lease the project to

-4-

another company, "provided, however, this shall not affect [Delta's] continuing absolute and unconditional obligation to pay Basic Rent in accordance with Section 4.4 hereof." (Ordinance §§ 8.2(a)-(c).)

## III.   The Parties' Interpretations of "Amounts Representing Basic Rent"

The parties have advanced two plausible competing interpretations of the Bondholders' right to "amounts representing Basic Rent." The Port asserts that Basic Rent is limited to rent paid by Delta or rent paid by other companies who lease the Project in mitigation of Delta's unextinguished absolute and unconditional rent obligations under the lease. Under this line of reasoning, the Bondholder's right to Revenues was extinguished when Delta's absolute and unconditional Basic Rent obligations were extinguished because the remedies available to U.S. Bank are inextricably linked to Delta's obligations under the Lease. U.S. Bank, acting on behalf of the Bondholders, argues that the Bondholders' right to Basic Rent includes any reletting proceeds obtained from leasing the Project, regardless of whether the reletting occurs before, after, or in conjunction with resolution of Delta's absolute and unconditional obligations under the Lease.

U.S. Bank's interpretation is supported by the Ordinance's definition of Revenues, which specifically identifies reletting proceeds as part of the Revenues to which the Bondholders are entitled. (Ordinance § 1.1.) As discussed above, the Ordinance defines Basic Rent as not only rental payments made by Delta, but also payments made by "*any* successor or assign." (Ordinance § 1.1 (emphasis added).) When the definition of Basic Rent is substituted into the definition of Revenues, the Bondholders' right to Revenues includes not only rental payments made by Delta or any successor or assign, but also any amounts representing rental payments made by Delta or any successor or assign "obtained by the trustee or the Issuer through the exercise of the remedies provided in the Lease or this Ordinance (including any reletting proceeds)." (*See* Ordinance § 1.1.)

In other words, because the definition of Basic Rent includes payments made by any successors and assigns under the lease, "amounts representing Basic Rent" must include something in addition to, or broader than, rental payments made by Delta or any successor or assign under the Lease. The Lease specifically provides for a reletting remedy (Lease § 8.2(c)), and the Ordinance expressly states that "*any* reletting proceeds" obtained as a remedy for Delta's default meet the definition of "amounts representing Basic Rent" (Ordinance § 1.1 (emphasis added).).

The Port's contrary interpretation of Revenues and Basic Rent effectively deprives the Bondholders of their expressly granted right to reletting proceeds without offering language from the contract that unambiguously supports imposing such a limitation. In arguing that a reletting remedy must be exercised "against Delta," the Port suggests that the remedies of reletting or subletting are a duty "owed to Delta in mitigation of Delta's liability." (Pl.'s Mem. in Supp. (#19) 14.) The Port reasons that the Bondholders have no further right to reletting proceeds because the discharge of Delta's liability through settlement has also discharged the Bondholders' duty to mitigate Delta's damages. This interpretation makes sense in the context of the subleasing remedy provided by section 8.2(b), which allows U.S. Bank to "use reasonable efforts to sublease the Project *for the account of the Company*, holding the Company liable for the difference between the amounts payable by such sublessee and amounts due and payable by the Company hereunder." (Lease § 8.2(b) (emphasis added).) Under this subleasing remedy, the sublessee mitigates Delta's damages, and Delta's ultimate obligation under the Lease can only be calculated by reference to the amounts paid by the sublessee.

The Port's interpretation becomes problematic in the context of section 8.2(c), however, which gives U.S. Bank the right to terminate the Lease and lease the Project to another company. Unlike the remedy provided in section 8.2(b), U.S. Bank's right to terminate the Lease and relet the

Project "shall not affect" Delta's absolute and unconditional rental obligations. (Lease § 8.2(c).) Although section 8.2(c) clarifies that the act of terminating the Net Lease and re-leasing the Project does not relieve Delta of its Basic Rent obligation, section 8.2(c) does not indicate that the reverse is true—that relieving Delta of its Basic Rent obligation extinguishes the Bondholders' right to reletting proceeds from another company.

Furthermore, there is little support for the Port's argument that the reletting power under section 8.2(c) is provided for the benefit of Delta, not the Bondholders. (*See* Pl.'s Mem. in Supp. (#19) 13-14.) The Port's argument fails because the Lease's remedial provisions bestow rights for the benefit of the Bondholders *in addition* to imposing a duty for the benefit of Delta. (*See* Lease § 8.3 (indicating that U.S. Bank may enforce the remedies provisions "for the benefit of Owners of the Bonds"); Lease § 8.4 (providing that the listed remedies are "conferred upon or reserved to" the Port and U.S. Bank).)  In light of the Bondholders' express interest in some form of reletting proceeds, as well as language indicating that the remedies provisions exist for the benefit of the Bondholders, it is not at all clear that the Lease requires the Bondholders to redeem their interest solely in conjunction with proceedings against Delta. Under the Lease and the Ordinance, the Bondholders' right to reletting proceeds may exist independent of the Bondholders' duty to mitigate, so long as the reletting proceeds are obtained as a remedy for rental payments that were not made by Delta (i.e., the reletting proceeds do not exceed the scope of the Lease).

More fundamentally, the Port's construction of "Basic Rent" leads to inequitable results by granting the Port a windfall of profits to which it would not have been entitled in the absence of Delta's default, while simultaneously eliminating any opportunity for the Bondholders to recoup their investment. Allowing U.S. Bank the right to relet the Project only as long as Delta's obligation remains outstanding is not only impractical in the context of Delta's bankruptcy but fundamentally

inconsistent with the parties' intent to protect and remunerate the Bondholders. (*See* Ordinance § 7.3 (requiring the Port to avoid "any action by which the rights of the Trustee or the Bondholders will be impaired" and requiring the Port to "take such further action as may be necessary and reasonable or proper to carry out the purpose of this Ordinance.").

## CONCLUSION

Because a reasonable interpretation of the Ordinance is that the Bondholders have a right to reletting proceeds that exists independent of their claims against Delta, Plaintiff's Motion for Summary Judgment (#18) is DENIED.

IT IS SO ORDERED.

DATED this __24th__ day of August, 2010.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court